UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**DEVAYATAN, LLC,**

        **Plaintiff,**

v.                                       **Case No:  6:14-cv-561-Orl-41TBS**

**TRAVELODGE HOTELS, INC.,**

        **Defendant.**

**ORDER**

THIS CAUSE is before the Court on cross motions for summary judgment (Doc. Nos. 38, 39). This case stems from a failed franchisee-franchisor relationship. As a result of the termination of the Franchise Agreement, Plaintiff, Devayatan, LLC ("Devayatan") filed suit against Defendant Travelodge Hotels, Inc. ("THI"), alleging negligent misrepresentation and violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq*. (*See generally* Compl., Doc. 1). THI then filed a counterclaim against Devayatan, alleging various breach of contract claims. (Countercl. & Third Party Compl., Doc. 14, ¶¶ 1–46).  THI also filed a third-party complaint against Sanjay Mehta, Ajay Mehta, Indira Mehta, and Bijoy Mehta ("Third-Party Defendants"), alleging that the Third-Party Defendants breached the guaranty they signed in association with the Franchise Agreement. (*Id.* ¶¶ 47–50).

THI has moved for summary judgment on its counterclaims and third-party claims and for summary judgment in its favor on Devayatan's claims against it. Devayatan argues that there is a genuine issue of material fact with regard to its claims against THI, and Devayatan and the Third-Party Defendants assert that they are entitled to summary judgment in their favor on THI's claims.

As set forth below, Devayatan and the Third-Party Defendants' Motion for Summary Judgment will be denied and THI's Motion for Summary Judgment will be granted in part and denied in part.

## I.  BACKGROUND

The Franchise Agreement at issue here was between THI, the franchisor, and Devayatan, which operated a hotel as a Travelodge franchisee. (Franchise Agreement, Doc. 40-4, at 1). In the fall of 2010, Devayatan began looking into purchasing the hotel at issue, which was operating as a Travelodge at the time. (A. Mehta Dep. Part 1, Doc. 42-15, at 16:20–17:2, 18:12–19:5). One of the primary factors that interested Devayatan was the fact that the hotel was part of the Travelodge brand, which Devayatan believed to be a good quality brand. (*Id.* at 18:12–19:5).

In preparation for purchasing the property and entering into the Franchise Agreement, representatives of Devayatan, Dr. Bijoy Mehta ("Dr. Mehta") and his son Ajay Mehta ("A. Mehta") stayed at the hotel for approximately two nights in early September, and for approximately one month in late September or October 2010. (*Id.* at 16:20–17:4; Dr. Mehta Dep., Doc. 42-1, at 22:2–18, 23:15–24). Devayatan also hired an architect, Krishna Misra, to go to the hotel and create proposals for suggested renovations. (*See* Nov. 18, 2010 Misra & Assocs. Letter, Doc. 40-1, at 2).[1] Misra visited the hotel three times during October and November 2010. (*Id.*). As a result, Devayatan received a letter laying out Misra's impressions of the hotel along with suggested renovations. (*Id.*). Misra's impression of the property was dismal. Misra observed, among other things, that the dumpster pad was "inefficient and insufficient"; that the swimming pool and surrounding fence were in severe "disrepair"; that the "main reception/registration area needed to be redesigned"; that the breakfast area needed "enlargement" and a "complete makeover

---

[1] Where, as here, an attachment contains multiple documents, pinpoint citations refer to the electronic page numbers.

and modernization"; that "most of the guest rooms" needed "complete replacement" of the mattresses and other furniture and furnishings; that the guest bathrooms were not functioning properly; that there was mold and mildew in some of the rooms; that the dumpster area needed to be cleaned and redesigned; that the electrical panels and circuit breakers were insufficient; that the periphery fence around the property needed to be replaced; that the outdoor lighting needed to be improved due to security concerns; and that the roof needed repair. (*Id.* at 2–4). In addition to Misra's observations, THI disclosed the hotel had been inspected and there were items that were not in compliance with brand standards, which needed to be corrected. (Schedule D, Doc. 40-4, at 44).[2] In addition, Schedule D to the Franchise Agreement discloses that the hotel was in default at the time of the transfer. (Schedule D at 39 ("[Y]our transferor received one or more notices of default from [THI] . . . regarding the Facility's failure to meet System Standards. Your transferor did not cure the default . . . . We have . . . entered into this Agreement in reliance upon your promise . . . to improve, equip and supply the Facility in accordance with System Standards."))[.3]

Despite all of this information, Devayatan chose not to have the property inspected by a building inspector nor did it obtain estimates from a contractor on how much it would cost to make the suggested renovations.[4] (Dr. Mehta Dep. at 20:21–21:6). In fact, Devayatan did not even conduct its own inspection of the property; the only guest rooms viewed by Devayatan prior to purchasing the property and signing the Franchise Agreement were the two or three rooms

---

[2] Schedule D is an addendum attached to the Franchise Agreement and is filed on the docket in the same document as the Franchise Agreement. For ease of reference, the Court will cite the electronic page number for Schedule D.

[3] Although Devayatan contends that it was not notified of the prior defaults, both Dr. Mehta and A. Mehta acknowledge that they received the Franchise Agreement, which included Schedule D. The fact that they did not read the contents of Schedule D does not mean that the prior defaults were not disclosed.

[4] Misra estimated that a portion of the renovations would cost approximately $1,974,462.00. (Misra & Assocs. Estimate, Doc. 40-1, at 5).

occupied by Devayatan representatives who visited the property. (*Id.* at 22:4–24:15). According to Devayatan, the previous owners would not allow Devayatan representatives to inspect other guest rooms. (*Id.* at 22:23–23:7). This, apparently, did not raise Devayatan's suspicions that the rooms were sub-par. In retrospect, A. Mehta conceded that he should have been more diligent about determining what the property required from a structural standpoint. (A. Mehta Dep. Part 1 at 36:15–37:3).

On February 11, 2011, Devayatan purchased the property and entered into the Franchise Agreement with THI. (A. Mehta Aff., Doc. 38-1, ¶¶ 6–7). As part of the Franchise Agreement, Devayatan was provided with a Franchise Disclosure Document ("FDD"), which estimated that the initial investment for a 100-room conversion facility would range from $177,370.00 to $1,409,460.00, depending on the quality of the property being converted.[5] (FDD, Ex. 8 to Dr. Mehta Dep., Doc. 42-3, at 6). It is undisputed that the Devayatan property was a 134-room facility, (*see* Schedule D at 43), and therefore, logically, would cost more than a 100-room facility of the same quality. The FDD also explained that "[b]uying a franchise is a complex investment," that the party should "[r]ead all of [the Franchise documents] carefully" and suggested that the franchisee review the documents with "an advisor, like a lawyer or accountant." (FDD at 6). Indeed, Devayatan was represented by counsel at least with regard to the closing of the property. (Dr. Mehta Dep. at 17:1–5). Nevertheless, both Dr. Mehta and A. Mehta testified that they did not read the FDD or the Franchise Agreement. (Dr. Mehta Dep. at 39:8–20, 44:13–18; A. Mehta Dep. Part 1 at 39:16–40:12, 44:8–15).

---

[5] Dr. Mehta testified that he saw a document estimating that the top-end investment would be $700,000.00. (Dr. Mehta Dep. at 39:22–25). However, Dr. Mehta has been unable to identify any such document, and he testified that he did not read either the FDD or the Franchise Agreement. (*Id.* at 39:8–12, 41:20–21).

The Franchise Agreement provided, in relevant part, that Devayatan was required to "renovate the Facility as provided in Schedule D." (Franchise Agreement ¶ 3.1). Schedule D includes a "punch list," which "identifies specific items inspected at the Facility [that] were not in compliance with brand standards" "based on a random sample inspection of the Facility during the quality assurance evaluation on the date specified." (Schedule D at 44). It further provides that "[i]n addition" to complying with the punch list, Devayatan was "responsible for ensuring that the Facility is constructed, improved, maintained and operated in compliance with all applicable federal, state and local laws, codes, ordinances and regulations" and that Devayatan "may need to take additional actions to meet brand standards or comply with law." (*Id.*). Finally, the punch list indicated that "[t]he reference provided is in no way complete instructions on the work required to fulfill the punchlist requirements." (*Id.*).

The Franchise Agreement also explained that the hotel would be subject to periodic Quality Assurance ("QA") inspections to ensure that the hotel was meeting the required brand standards. (Franchise Agreement ¶ 4.8). If the hotel received a failing grade, the hotel would be reinspected, at the franchisee's cost, every ninety days until it received a passing grade. (*Id.*; Palacios Dep., Doc. 42-19, at 19:17–21:13). Further, three consecutive failing grades would result in a default under the Franchise Agreement. (Fenimore Dep., Doc. 42-18, at 28:10–20; *see also* Franchise Agreement ¶ 11.1). However, THI, in its discretion, could opt to allow the franchisee to cure the default rather than terminate the agreement. (*See* Franchise Agreement ¶ 11.1; Fenimore Dep. at 29:14–30:1, 33:2–18). In addition, the franchisee could submit an improvement plan for THI's approval. (Franchise Agreement ¶ 11.1; Fenimore Dep. at 38:1–39:20).

The improvement plans consisted of a list of deficiencies based on the most recent QA inspection and deadlines by which those deficiencies were to be cured. (Palacios Dep. at 15:15–

20, 21:12–22:7; Fenimore Dep. at 38:1–39:20). A list of the deficiencies was automatically generated immediately after the QA inspection and was available through THI's internal "MyPortal" website. (Fenimore Dep. at 38:18–23). The franchisee would then input dates by which it believed it could cure the noted deficiencies and would submit the proposed dates to THI. (*Id.* at 39:2–9). THI would then either approve or deny the improvement plan. (*Id.* at 39:15–20). The improvement plan, if approved, would be valid until the next QA inspection. (*See e.g.*, Feb 19, 2013 Improvement Plan, Ex. 10 to Palacios Dep., Doc. 42-21, at 35). At that time, if all of the items with deadlines prior to the inspection were completed and the franchisee was on target with the items with later deadlines, the improvement plan would stay in place and the franchisee would not receive a default for the items that had not been completed. (*Id.*). If, however, the franchisee failed to meet deadlines prior to the next QA inspection, the improvement plan became null and void. (*Id.*).

Generally, completing an improvement plan, or otherwise curing the deficiencies, and then passing a subsequent QA inspection is the only way to cure a default. (Palacios Dep. at 16:12–23). However, there is a small exception under THI's operational supplies and equipment ("OS&E") program. (*Id.* at 25:6–22; Fenimore Dep. at 51:24–52:4). Specifically, THI required its Travelodge hotels to utilize certain brand-specific products. For example, all hotel staff was required to wear THI-approved uniforms with name tags. (*See* Palacios Dep. at 36:4–11). Also, there were certain products, such as "EarthSmarth linen reuse cards," that were required to be placed in the guest rooms. (*See* A. Mehta Dep. Part 2, Doc. 42-16, at 192:16–25). If a hotel lost points in a QA inspection for failing to have all of the required OS&E products, it could obtain the products and submit proof to THI within thirty days of the inspection, and THI would raise the franchisee's

score accordingly. (Fenimore Dep. at 52:5–18; OS&E Compliance Initiative, Ex. 45 to A. Mehta Dep., Doc. 42-17, at 98).

THI did not conduct its first QA inspection of Devayatan's hotel until September 10, 2012—approximately one year and seven months after Devayatan purchased the hotel and entered the Franchise Agreement. (Joint Pretrial Statement, Doc. 52, ¶ 63;[6] Sept. 10, 2012 Quality Assurance Report, Ex. 16 to Dr. Mehta Dep., Doc. 42-9, at 6). All of the items set forth in the punch list were required to be completed within six months (or sooner), (Schedule D at 46–48); therefore, THI gave Devayatan more than a year beyond the punch list deadlines before it inspected the property. Devayatan, however, did not complete all of the punch list items within that timeframe, and it received a failing grade on that inspection. (Sept. 10, 2012 Quality Assurance Report at 6). Thereafter, Devayatan received four more failing inspections on December 20, 2012; February 19, 2013; August 22, 2013; and November 12, 2013. (Joint Pretrial Statement ¶¶ 66, 68–70). After the February 19, 2013 inspection, Devayatan entered an improvement plan, (A. Mehta Dep. Part 2 at 154:21–155:20; Feb. 19, 2013 Improvement Plan, Ex. 43 to A. Mehta Dep., Doc. 42-17 at 53–66), but when it failed to comply with the deadlines set forth in the plan, it became null and void.

Devayatan explained to THI that it was having trouble completing the QA items because it was required to do so many unexpected renovations in order to bring the hotel up to code. (Letter to Fenimore, Ex. 25 to Dr. Mehta Dep., Doc. 42-12, at 13–15). Indeed, during the three years Devayatan was licensed as a Travelodge, it completed the following: repaired the fire alarm system for approximately $40,000.00; repaired the electrical system for approximately $40,000.00;

---

[6] The Joint Pretrial Statement states that the first inspection was September 10, 2012, but then, apparently incorrectly, calculates that this was seven months, rather than a year and seven months, after Devayatan purchased the property and entered the Franchise Agreement.

repaired the dumpster area and drainage system next to the hotel for approximately $35,000.00; repaired the 1,000 foot fence on the east side of the hotel for approximately $26,000.00; replaced all of the old mattresses and the carpet throughout the hotel, and generally improved the guest rooms for approximately $250,000.00; repaired the swimming pool and the surrounding deck for approximately $130,000.00; constructed a new breakfast area for approximately $120,000.00; painted the exterior of the hotel for approximately $65,000.00; spent approximately $45,000.00 on landscaping the hotel grounds and tree removal; and constructed a new clubhouse with meeting rooms and a fitness center for approximately $170,000.00. (A. Mehta Aff. ¶¶ 12, 14). Nevertheless, Devayatan continued to fail its QA inspections.

After the failed August inspection, Devayatan wrote a letter to THI, requesting that it not perform QA inspections in November or December 2013 because the coffee shop and the breakfast area would be under construction during those months. (Letter to Palacios, Ex. 29 to Dr. Mehta Dep., Doc. 42-13, at 10). Ignoring Devayatan's request, THI conducted a QA inspection on November 12, 2013. Although Devayatan received a failing grade at this inspection, it was very close to passing; a passing score was 70%, and the hotel received a score of 61.39%. (Nov. 12, 2013 QA Inspection Report, Ex. 44 to A. Mehta Dep., Doc. 42-17, at 69; A. Mehta Aff. ¶ 18).

According to both A. Mehta and the manager of the hotel, Valentino Victor, the inspector stated that if Devayatan purchased and implemented its missing OS&E products within thirty days from the November 12, 2013 QA inspection, it would receive a passing score for the inspection. (Victor Dep., Doc. 38-2, at 20:4–14; A. Mehta Aff. ¶ 19). Subsequently, the Director of Operational Services, Veronica Palacios, made statements that could at least be reasonably

construed as confirming the inspector's representations.[7] (Nov. 23, 2013 Palacios E-mail, Ex. 45 to A. Mehta Dep., Doc. 42-17, at 97 ("[P]lease work diligently on those OS&E items to see if there is a possibility of scoring a "D."); A. Mehta Aff. ¶ 21; A. Mehta Dep. Part 2 at 197:13–17). Relying on these statements, Devayatan purchased and implemented at least some of the OS&E products. (Victor Dep. at 20:10–19, 21:3–25:10). There is an issue of fact as to whether Devayatan purchased all of the missing products. Prior to the thirty-day deadline, Devayatan submitted photographic evidence of the OS&E purchases to Palacios. (*Id.* at 23:2–14). However, Palacios instructed Devayatan to submit the evidence by uploading the pictures to THI's internal "MyPortal" website. (*Id.* at 27:19–23). Devayatan attempted to do so, but there were technical problems with the website. (*Id.* at 27:25–29:7). As a result, Devayatan was not able to upload the proof of its OS&E purchases by the thirty-day deadline.

There is also confusion over an improvement plan based on the November 12, 2013 inspection. Three days after the inspection, Palacios visited the hotel and met with A. Mehta and Victor to go over the inspection and prioritize the work that needed to be done. (Palacios Dep. at 34:6–35:3; A. Mehta Aff. ¶ 21). During this meeting, Palacios used her laptop to pull up the automatically generated improvement plan form. (Palacios Dep. at 34:8–11). She used the plan as a tool to discuss with A. Mehta and Victor the deficiencies in the hotel. (*Id.*). In doing so, Palacios entered dates by which Devayatan believed it could cure the deficiencies. (*See* November 12, 2013 Improvement Plan, Ex. 45 to A. Mehta Dep., Doc. 42-17, at 115–126). Palacios also made notes of deficiencies that Devayatan had already cured, such as obtaining a manager-on-duty sign.

---

[7] Palacios now testifies that she does not recall making these statements and that she did not believe curing all of the OS&E deficiencies would have brought Devayatan's score high enough to pass. However, Palacios's testimony is contradicted by an e-mail sent by her at the time that indicated that Devayatan may be able to bring its score up to a "D" if it completed the OS&E items. (Nov. 23, 2013 Palacios E-mail at 97).

(Palacios Dep. at 35:4–12, 36:19–37:1; A. Mehta Aff. ¶ 22). A. Mehta understood that Palacios was submitting the improvement plan on Devayatan's behalf. (A. Mehta Aff. ¶¶ 21–23). Palacios, on the other hand, testified that she did not submit the improvement plan for approval because she was using the document as a discussion tool only. (Palacios Dep. at 32:18–33:4).

Finally, on December 31, 2013, THI terminated Devayatan's Franchise Agreement. (Notice of Termination, Ex. 32 to Dr. Mehta Dep., Doc. 42-13, at 51). The decision was based on THI's determination that Devayatan was not improving and maintaining the hotel in accordance with THI's brand standards. (*Id.* ("This termination is a result of your failure to cure your default under the agreement, due to your failure to satisfy the required quality standards.")). The decision-makers did not consider Devayatan's efforts to comply with the OS&E requirements beyond the thirty-day deadline or the fact that they had technical difficulties submitting proof of compliance. (*See* Fenimore Dep. at 52:19–55:5). Subsequent to the termination, Devayatan refused to pay certain fees THI claimed it owed because Devayatan believed that THI improperly terminated the Franchise Agreement. (Dr. Mehta Dep. at 123:2–124:8). Accordingly, this suit was initiated.

## II.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson*, 477 U.S. at 251–52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### III.   ANALYSIS

As noted, Devayatan asserts claims of negligent misrepresentation and violations of FDUTPA against THI; these claims are based on the same underlying factual allegations. THI, on the other hand, asserts various breach of contract claims against Devayatan and the Third-Party Defendants. Each will be discussed in turn.

#### A.   Negligent Misrepresentation

Devayatan's negligent misrepresentation claim relates to the scope of work required to bring the hotel up to THI's brand standards. Essentially, Devayatan asserts that several representations made by THI during the Franchise Agreement negotiations, taken together, resulted in a misrepresentation that the scope of work necessary to bring the hotel into compliance with THI's brand standards was much smaller than it turned out to be.

First, Devayatan relied on the fact that THI had not terminated the previous owner's franchise agreement to conclude that the hotel was meeting, or at least was close to meeting, THI's brand standards at the time of purchase. Devayatan asserts that this presumption was supported by

THI's statement in the documents submitted to the lender that "no uncured notices of default [were] issued to [Devayatan] by [THI] under the" Franchise Agreement. (Three Party Agreement, Doc. 43-2, ¶ 1). Next, Devayatan relied on the punch list as a comprehensive list of everything that needed to be done for the hotel to be in perfect compliance with THI's brand standards. Additionally, many items on the punch list provided that Devayatan was required to replace or repair those items "where non-compliant" or "where missing"—such as "provide hairdryers where missing"— (Schedule D at 48), Devayatan presumed that it would be a small number of items otherwise the punch list would have said to replace all of the items.

Once Devayatan began operating the hotel, however, it discovered that its understanding of the punch list was "grossly inadequate." (Dr. Mehta Dep. at 62:13–16). The non-compliant or missing items, rather than only being a small number, needed to be replaced in virtually every guest room. In addition, there were many renovations that had to be undertaken in order to comply with state, city, and county law—such as upgrades to the electrical and fire systems and renovation of the dumpster area—that were not included on the punch list.

Although not entirely clear, it appears that Devayatan is arguing that it would not have entered the Franchise Agreement absent these alleged negligent misrepresentations.[8] The parties

---

[8] To the extent Devayatan is arguing that these representations changed the terms of the Franchise Agreement, such an argument is prohibited by the parole evidence rule and the fact that the Franchise Agreement contains an integration clause (Franchise Agreement ¶¶ 17.7.2 & 17.7.3). To the extent Devayatan is arguing that THI did not comply with the Franchise Agreement, such a claim must be brought under a breach of contract theory, not a tort theory. *See Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002) ("Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."). Devayatan's argument that THI omitted the fact that Devayatan would be docked points on the QA inspection for portions of the hotel that were under renovation appears to be based on one of these theories—i.e., Devayatan is either arguing that THI agreed to change the compliance requirements set forth in the Franchise Agreement (parole evidence) or that THI improperly terminated the contract (breach of contract). Either way, these theories fail under a negligent misrepresentation cause of action.

agree that New Jersey law applies to this analysis. To prevail on a claim for negligent misrepresentation under New Jersey law, Devayatan must establish (1) that THI negligently made an incorrect statement; (2) that Devayatan justifiably relied on that statement; and (3) that Devayatan sustained damages as a result of the reliance. *Green v. Morgan Props.*, 73 A.3d 478, 493–94 (N.J. 2013).

Devayatan has failed to show that it justifiably relied on any incorrect statements. Devayatan argues that the alleged representations were misleading given the surrounding circumstances. However, the presumptions Devayatan made were unreasonable in light of the other, explicit statements made by THI. First, THI put Plaintiff on notice that the previous owners were in default under their franchise agreement and it was Plaintiff's responsibility to cure those defaults. Second, the punch list itself explained that "in addition" to the punch list, Devayatan was "responsible for ensuring that the [hotel] is constructed, improved, maintained and operated in compliance with all applicable federal, state and local laws, codes, ordinances and regulations." (Schedule D at 44). This statement clearly indicates that the punch list does not include renovations necessary to comply with state and local laws and codes. Moreover, the punch list states that it "was based on a random sample inspection of the [hotel] during [a] quality assurance evaluation." (*Id.*). Therefore, Devayatan's assumption that THI performed a full inspection of the property, including an inspection to determine if the building complied with applicable codes and ordinances, is patently unreasonable. Moreover, the fact that Devayatan's members did not actually read any of the disclosure documents or the Franchise Agreement does not change the outcome. Devayatan's willful ignorance of the contents of documents it signed cannot be used to transform THI's otherwise clear statements into misrepresentations. Additionally, Devayatan's assumptions are made more unreasonable given the fact that their own architect noted that the

property was "in a very poor state of disrepair" and that "it did not meet even some of the basic parameters of a similar functioning facility." (Nov. 18, 2010 Misra & Assocs. Letter at 1).

Accordingly, THI is entitled to summary judgment on Devayatan's negligent misrepresentation claims.

### B. FDUTPA

As an initial matter, it is unclear whether Devayatan can bring a FDUTPA claim because both of the parties have agreed that New Jersey law applies here. Nevertheless, neither party addresses this issue in their briefing, therefore, the Court will assume that the claim is properly brought.

Devayatan's FDUTPA claim "is based on the same factual matters which underlie its negligent misrepresentation claim." To prevail on a FDUTPA claim, Devayatan must prove "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). "A deceptive practice is one that is likely to mislead . . . . An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (quotation omitted). As set forth in the negligent misrepresentation analysis, Devayatan has not established that THI's statements were "likely to mislead." Furthermore, Devayatan has offered no argument that THI acted unethically in any manner other than making representations that Devayatan misunderstood.[9] Accordingly, Devayatan has failed to establish that it is entitled to relief under FDUTPA, and THI is entitled to summary judgment on that claim.

---

[9] The Court notes that arguments regarding whether THI properly terminated the Franchise Agreement are not considered in the FDUTPA analysis because those arguments would go to a breach of contract claim, and, as noted previously, such a claim cannot be brought under a tort theory. Nevertheless, those arguments will be considered in the analysis of THI's breach of contract claims and Devayatan's and Third-Party Defendants' affirmative defenses of prior breach.

### C. THI's Counterclaims and Third-Party Claims

THI's counterclaims and third-party claims are based on alleged breaches of the Franchise Agreement and related personal guaranties. THI alleges that Devayatan still owes money under the Franchise Agreement and that the Third-Party Defendants signed personal guarantees and, therefore, they are also liable for the money due under the Franchise Agreement. Devayatan and the Third-Party Defendants argue that THI breached the contract by improperly terminating the Franchise Agreement, and therefore, Devayatan has no obligation to pay the fees under the Franchise Agreement. This prior breach argument is best viewed as an argument that THI terminated the Franchise Agreement in violation of the covenant of good faith and fair dealing.

Under New Jersey law, a prior material breach is an affirmative defense. *See Roach v. BM Motoring, LLC*, No. L-1333-14, 2015 WL 9853066, at *3 (N.J. Super. Ct. App. Div., Jan. 20, 2016) (per curiam) ("New Jersey contract law has long recognized the defense of prior material breach, under which one party's material breach of a contract provides a complete defense to the other party's further obligations under the contract."). A material breach "goes to the essence of the contract," *Ross Sys. v. Linden Dari-Delite, Inc.*, 173 A.2d 258, 265 (N.J. 1961), and to determine whether a party has committed a material breach, New Jersey courts consider the "extent to which the behavior of the party failing to perform . . . comports with standards of good faith and fair dealing." *Neptune Research & Dev., Inc. v. Teknics Indus. Sys., Inc.*, 563 A.2d 465, 470–71 (N.J. Super. Ct. App. Div. 1989). The implied covenant of good faith and fair dealing exists in every contract, *Palisades Props., Inc. v. Brunetti*, 207 A.2d 522, 531 (N.J. 1965) ("[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (quotation omitted)), including "contracts that contain express and unambiguous provisions permitting either

party to terminate the contract without cause." *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997).

"[M]yriad forms of conduct . . . may constitute a violation of the covenant of good faith and fair dealing," and "[e]ach case is fact-sensitive." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005). For instance, in varying contexts, "hypocrisy," "subterfuge," and "evasions" have amounted to breach of the implied covenant. *See id.* at 397–99; *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349, 351 (N.J. 1976). In cases involving breach of the implied covenant, circumstantial evidence can establish the necessary bad motive. *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1132 (N.J. 2001) ("This Court has approved the observation that '[w]hat a person's intentions were need not be proved from what he said, but they may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation.'" (quoting *Mayflower Indus. v. Thor Corp.*, 83 A.2d 246, 257 (N.J. Super. Ct. Ch. Div. 1951)).

Here, the Franchise Agreement gives THI the discretion to terminate the Agreement based on a franchisee's failure to meet the brand standards. From what the Court can discern, Devayatan and the Third-Party Defendants argue that THI did not act in good faith in exercising its discretion. As set forth below, there is a genuine issue of material fact regarding whether THI breached the covenant of good faith and fair dealing, and therefore, summary judgment is inappropriate.

As noted, Devayatan failed its November 12, 2013 QA inspection by a small margin. Due to the small margin, at least the inspector, and perhaps Palacios, told Devayatan that it could improve its November 12, 2013 inspection score to a passing level by remedying the OS&E issues within thirty days. Devayatan represents that it fully complied and remedied all of the OS&E deficiencies within the time-frame but that it was not able to upload proof due to problems with

THI's MyPortal website. Nevertheless, Devayatan maintains that it notified THI representatives that it complied. While THI disputes whether Devayatan actually completed all of the OS&E items and whether Devayatan put THI on notice of doing so, this is an issue of fact that cannot be resolved on summary judgment.

In addition, there is an issue of fact regarding a purported November 15, 2013 improvement plan. Specifically, there is an issue of fact regarding whether Palacios—a THI representative—led Devayatan to believe that THI and Devayatan had entered an improvement plan or that the improvement plan would be submitted for approval when Palacios had no intention of submitting the plan.

The above-described issues of fact are material to the issue of whether THI breached the covenant of good faith and fair dealing when exercising its discretion under the Franchise Agreement.[10] *See Wilson*, 773 A.2d at 250 (noting that discretion afforded to a party under a contract is not "unbridled discretion" and that it "is tempered by the implied covenant of good faith and fair dealing and the reasonable expectations of the parties"). Accordingly, the Court cannot enter summary judgment as to THI's counterclaims and third-party claims.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Devayatan and Third-Party Defendants' Motion for Summary Judgment (Doc. 38) is **DENIED**.

2. THI's Motion for Summary Judgment (Doc. 39) is **GRANTED in part** and **DENIED in part**.

---

[10] Devayatan's equitable estoppel argument appears to rely on the same set of facts as the prior breach argument; therefore, there are issues of material fact as to that argument as well.

3. THI is entitled to judgment as a matter of law on Devayatan's claims of negligent misrepresentation and violations of FDUTPA. However, genuine issues of material fact exist as to THI's counterclaims and third-party claims and the affirmative defenses thereto, requiring that those claims be submitted to the trier of fact.

**DONE** and **ORDERED** in Orlando, Florida on June 24, 2016.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record